**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONALD J. STONE AND** | : | **CIVIL ACTION-LAW** |
| **DEBORAH L. STONE** | : | |
| **Plaintiffs** | : | **HONORABLE JUDGE JONES,III** |
| **Vs.** | : | |
| | : | |
| **SHAWN WALTMAN,** | : | **NO. 4:17-CV-0864** |
| **JAMES WOOL, CORRECT** | : | |
| **CARE SOLUTIONS, LLC,** | : | |
| **LESLIE BLAIR-MORRISON,** | : | |
| **WENDY NICHOLAS,** | : | |
| **WILLIAM FRANTZ, JOHN** | : | |
| **WETZEL, MICHAEL SHIREY,** | : | |
| **AARON BIICHLE, ROBERT** | : | |
| **SMITH, TYREE C. BLOCKER,** | : | |
| **CHELSEY CAMP, CHERYL** | : | |
| **BASKERVILLE** | : | |
| **Defendants** | : | |

## **PLAINTIFFS' ANSWERS TO DEFENDANTS' STATEMENT**

## **OF UNDISPUTED MATERIAL FACTS**

AND NOW comes Donald Stone and Deborah Stone, by and

through their Attorney, Gregory T. Moro, Esquire, and set forth

1

these Answers to Defendants' Statement of Undisputed Material Facts as follows:

1. Admitted in part. Denied in part.  Dr. Stone, at relevant times, was a physician employed by CCS contracted to work at SCI Muncy.  By way of further answer, Dr. Stone was the Medical Director at SCI Muncy, although employed by CCS (Stone deposition, page 18, lines 15-17).

2. Admitted.

3. Admitted.

4. Admitted.

5. Admitted.

6. Denied.  The Defendant's name is Shawn Waltman, not William Waltman, however, he was the Security Captain at SCI Muncy at times relevant hereto.

7. Admitted.

8. Admitted in part.  Denied in part.  It is admitted that the CHCA is not medical personnel at the DOC; however, it is denied that Morrison, at times relevant hereto, did not go outside her scope of duties. In meetings she would

2

frequently question Stone about his decision-making. By way of example, Morrison questioned Stone's use of patient intake forms completed by the inmates, telling him these forms had to be approved by the DOC before they could be used. (Morrison deposition, page 46, lines 6-25, page 47, lines 1-25, page 48, lines 1-6). Additionally, Stone had to seek Morrison's approval to bring medical students into SCI Muncy to assist with medical cases. (Stone Affidavit, P-2). This was a source of contention between Stone and Blair-Morrison. (Stone Affidavit, P-2). Additionally, Morrison improperly undertook duties of a PREA investigator, adhering to Waltman's request to meet with Baskerville on June 3, 2015 at 8:30 AM about the PREA allegations "inappropriate touching/kissing" between Stone and Camp. (Exhibit P-6, page 58). Stone frequently complained of his relationship with Blair-Morrison to Dr. Marc Landsburg, a colleague at SCI Muncy. Landsburg Affidavit, P-3).

9. Admitted in part. Denied in part. It is admitted that the CHCA's duties are set forth with the exception of monitoring

contract physician hours. However, Morrison did not adhere to the scope of her duties. She clearly acted outside the scope of her duties as is set forth in Paragraph Eight (8) above, which response is incorporated fully herein as if set forth at length. Also, see Stone Affidavit, Exhibit P-2, as to Blair-Morrison's duties.

10.   Admitted in part.  Denied in part.  Frantz was the PREA Compliance Manager at SCI Muncy at relevant times hereto. His duties were to ensure that the PREA Policy was being followed as written and to prepare for audits (Frantz deposition, page 10, lines 5-16).

11.   Admitted in part.  Denied in part.  It is admitted Frantz was not a PREA investigator.  It is specifically denied he had no involvement in the Camp PREA case.  Frantz's role was a "Reviewer".  His role also included making sure the PREA Policy was followed (Frantz deposition page 17, lines 12-25). Waltman did not follow PREA Policy, as he mandated that Stone remain at SCI Muncy after Waltman's preliminary PREA investigation; thereby subjecting Stone to an illegal

4

detention and an illegal search.  Once the Pennsylvania State Police (PSP) initiated an investigation, the PREA investigation concluded until the disposition of the PSP criminal investigation.  (Waltman deposition, page 33, lines 15-24; Frantz deposition, page 18, lines 1-23). In addition, Waltman admits in his Suppression Court testimony, that Stone was not under the same guidelines as DOC employees.  (Exhibit P-1, pages 30-31).

12.  Admitted in part.  Denied in part.  It is denied that the PREA Compliance Officer's only role is as set forth by the Defendants herein.  The PREA Compliance Officer (Frantz) also has the responsibility to make sure that PREA policy was followed as written (Frantz deposition, page 10, lines 5-16).  Frantz failed to ensure that PREA Policy was being followed, as Waltman and Shirey violated the PREA Policy and the Fourth Amendment of the United States Constitution, by detaining Stone for three (3) hours and fifteen (15) minutes, post PREA interview, so he could be interviewed/seized by PSP Officer Wool and subject to a

search of his vehicle and office.  See Answer to Paragraph
Eleven (11) above, which is incorporated herein by
reference.

13.   Admitted in part.  Denied in part.  It is admitted Shirey
was a Corrections Officer at SCI Muncy at times relevant
hereto.  Importantly, he held a position as a Lieutenant and
was working in the Security Office at times relevant hereto.
Lt. Shirey participated in the Stone investigation.  Shirey's
investigation went well beyond PREA, as contrary to PREA
guidelines and the United States Constitution, Fourth
Amendment, Shirey participated in the search of Stone's
vehicle and office with PSP Trooper Wool and participated in
detaining Dr. Stone, escorting him to the bathroom to
prevent him from leaving SCI Muncy during a break. (Stone
Affidavit, P-2)

14.   Stone has agreed to voluntarily dismiss Defendant Tyree
Blocker from this Action.

15.   Denied.  The appropriate person is James Wool, who, at
times relevant hereto, was a Trooper with the Pennsylvania

State Police stationed in Montoursville. See Wool deposition, page 6, lines 1-4).

16.   Denied.  The PREA Policy is fully set forth in Defendants' Exhibit 4.The effective date is set forth therein as well. Notably, when the matter is referred to PSP for investigation, the internal PREA investigation stops.  (Biichle #1-referred to in depositions and attached hereto as Exhibit 1).  DOC policy requires that all employees shall cooperate in internal investigations conducted under authority of the DOC. (Biichle #2-referred to in depositions, page six (6)).

17.   Admitted.

18.   Admitted in part.  Denied in part.  Waltman received training in PREA in 2014 at SCI Albion. (Waltman deposition, page 20, pages 1-20).  It is not known where all other staff were trained or whether all staff were trained in PREA. Waltman did have some training in PREA investigation, however, notably, he had no training in administering "Miranda Warnings". (Waltman deposition, pages 24, lines 3-19). Waltman, in this particular matter and other

investigations, relied on PSP as liaisons to conduct the PREA

investigation if there were allegations which amounted to a

crime. (Waltman deposition, page 28, lines 9-11).

19.   Admitted in part.  Denied in part.  The Security Office

does investigate PREA violations, however, the OSII can

investigate as well.  (PREA Policy and Suppression Record,

Exhibit P-1,Page 9).

20.   Admitted, although there is nothing in PSP Trooper Wool's

report, nor his deposition testimony, wherein Waltman told

him Dr. Stone was being detained in a "holding cell" in the

prison Administration Building to avoid contact with Camp

nor Baskerville.  Had Dr. Stone been properly released after

the PREA investigation, he would have been "walked off" the

institution grounds, thereby ensuring that he had no contact

with Inmates Camp and Baskerville, who remained in their

infirmary cell.  Waltman/Wool required that Stone remain in

the holding cell for three and one-half (3 ½) hours.

Waltman made it clear to Wool and Stone that he could not

leave the Institution until Waltman granted permission.

(Wool deposition, page 27, lines 4-15; also Suppression Record,P-1, pages 54-57, inclusive).

21.   Denied. Wool received the dispatch and contacted Waltman. (Exhibit P-6, page 38).

22.   Admitted with exception that Baskerville and Camp were cellmates in the infirmary.

23.   Admitted in part.  Denied in part.  It is admitted that Baskerville did make the report as set forth in this Paragraph.  This was not Baskerville's only report.  On June 2, 2015, she made a report about Stone which referred to "inappropriate touching/kissing".  This report was given to Waltman, who referred the report to Morrison, as Baskerville had asked to speak with her about the report.  (Morrison deposition, page 83, lines 17-21). By way of further response, Baskerville and Camp's claims were spurious, as Camp was not released from Geisinger for her one day surgery in an "unconscious state". She would never have been released by Geisinger to return to SCI Muncy in an "unconscious state".

24. Admitted with exception that Waltman initially investigated the PREA complaint, referring the investigation to PSP and specifically Trooper Wool for a police investigation. (Waltman deposition, page 33, lines 10-15).

25. Admitted with clarification. Waltman, who received the PREA accusation against Stone, contacted Morrison to speak with Baskerville, the alleged eyewitness to the PREA incident on May 29, 2015. Morrison, at times relevant hereto, was not a PREA investigator. She was never a PREA investigator. (Morrison deposition, page 83, lines 17-21).

26. Admitted in part. Denied in part. It is admitted that Morrison did not have a formal list of questions, however, interviewers are not required under PREA nor any formal investigative methods to have a prepared set of interview questions. Morrison did interview Baskerville, the chief PREA witness/accuser of Stone at approximately 8:30 AM on June 3, 2015. The record of her interview is set forth in Exhibit P-3, pages 58-59. These interview notes were immediately provided to Waltman (Morrison deposition, page 27, lines

10

4-25, page 28, lines 1-11). There is no record of Waltman

sharing Morrison's report with Wool.

27.   Admitted, however, this came after Morrison's interview

of Baskerville.

28.   Admitted, however, this came after Morrison's interview

of Baskerville at 8:30 AM on June 3, 2015..

29.   Admitted with clarifications.  Waltman did contact

Morrison, who was not Stone's supervisor, to request that he

escorted to the Security Office, so he could have no contact

with Camp nor Baskerville.  (Suppression Record, page 27,

lines 1-11).

30.   Denied. See Suppression Record, Exhibit P-1, page 26.

31.   Denied.  Stone knew the location of the Security Office,

having been an employee of CCS at SCI Muncy for a

substantial time period.  Morrison did "escort" Stone to the

Security Office, stating to him, "It's never a good thing to

get called to the Security Office". (Suppression Record,

Exhibit P-1, page 26; Stone Affidavit, Exhibit P-2).

32.   Denied.  Stone was questioned in a "holding cell" in the
Security Office area. (Wool deposition, page 59 , lines 4-7).
The "holding cell" is a small area, wherein Stone did not
have his phone, access to his office, nor any access to the
outside world. (Wool deposition, page 20, lines 14-25 ).  The
"holding cell" is where inmates were questioned.  (Wool
deposition, page 20, lines 7-13 ).

33.   Admitted with clarification.  Wool arrived at 12:30 PM.  He
initially questioned Stone, without Mirandizing him, at
1:15 PM.  Questioning continued until 2:20 PM, wherein
Wool requested a consent to search, signed at 2:20 PM.
Stone's detention continued until 4:15 PM, when Waltman
walked him out of SCI Muncy. (Exhibit P-6, page 40 and
Stone deposition, page 54, lines 20-25 ).

34.   Admitted with clarification.  SCI Muncy's PREA
investigation was separate from the police investigation.
(Waltman deposition, page 33, lines 15-24, Frantz
deposition, page 18, lines 1-23).

35.  Admitted with clarification.  At Waltman's request, Shirey, part of the Security Office, accompanied Stone to the bathroom.  This occurred sometime between 2:20 PM and Wool's second interview with Stone. (Waltman deposition, page 138, lines 5-12 ). This was done to ensure that Stone did not leave the Institution. (Stone Affidavit, P-2).

36.  Admitted in part. Denied in part.  Waltman indicated that Stone advised him of the kiss after Wool's first interview, which concluded at approximately 2:20 PM.  Thereafter, Stone amended his PREA statement to include a fourth page, referencing the kiss.   (Waltman deposition, page 88 , lines 12-17).  Stone admits that Camp kissed him.  (Stone deposition, page 33, lines 4-5 ).

37.  Admitted with clarification.  Stone gave food items to several inmates and staff members, including Camp. (Stone deposition, page 29, lines 15-22 ).

38.  Admitted.

39.  Admitted with clarification.  This statement mischaracterizes the notes and Stone's deposition

testimony.  The notes between Camp and Stone were part of Stone's holistic approach to the practice of medicine, which focuses on treating the mind and body. (Stone deposition, page 30, lines 12-25; Exhibit P-6, page 39).

40.   Admitted with clarification.  This statement mischaracterizes the notes and Stone's deposition testimony.  The notes between Camp and Stone were part of Stone's holistic approach to the practice of medicine, which focuses on treating the mind and body. (Stone deposition, page 30, lines 12-25; Exhibit P-6, page 39). The DOC Policy does not specifically prohibit exchanging notes for medical treatment purposes.

41.   Admitted with clarification.  This statement mischaracterizes the notes and Stone's deposition testimony.  The notes between Camp and Stone were part of Stone's holistic approach to the practice of medicine, which focuses on treating the mind and body. (Stone deposition, page 30, lines 12-25 ). The DOC Policy does not specifically prohibit exchanging notes for medical treatment purposes.

14

42.   Admitted.

43.   Admitted in part.  Denied in part.  It is admitted that

Stone signed the consent to search form at 2:20 PM. Despite

being in custody/seized by the DOC and/or Wool (PSP),

Stone was never Mirandized.  He was never told that he was

free to leave without speaking to Wool.  (Wool deposition,

page 42, lines 11-16 ). Stone was told by Waltman that he

could not leave SCI Muncy until Waltman said otherwise.

(Wool deposition, page 42, lines 17-22 ). Wool never

countermanded Waltman, telling Stone, at least from his

viewpoint, Stone was free to leave. Further, Wool never told

Stone he was free to leave. (Wool deposition, page 42, lines

14-16 . ) (See also the Trial Court's Opinion, attached as

Exhibit P-4 in Commonwealth of Pennsylvania v. Stone,

Docket # 1762-2015, Lycoming County, wherein the State

Court gives a very thorough and persuasive analysis of

Miranda, the detention and the alleged consent search.

Affirmed by the Pennsylvania Superior Court in 1657 MDA

2016, attached hereto and incorporated herein as Exhibit P-5).

44.   Admitted in part.  Denied in part. It is admitted Wool searched Stone's vehicle and found a black notebook. Based on inspection of the note Camp provided to Waltman, Wool believed the note Camp produced came from Stone's notebook. (Wool deposition, page 44, lines 13-25 ).

45.   Admitted with clarification that Shirey was employed by the DOC Security Office on June 3, 2015.  While Wool commenced with his investigation on June 3, 2015, causing Waltman to stop or suspend the PREA investigation, Shirey assisted Wool in obtaining the notebook via search of Stone's vehicle, further violating Stone's Constitutional Rights under the Fourth Amendment to the United States Constitution. (See Exhibit P-6, page 40).

46.   Denied.  Stone was seized at 12:30 PM.  He was not permitted to leave SCI Muncy, despite his cooperation with the PREA investigation.  Further, Wool, in his second interview with Stone, did not eliminate the possibility that

Stone could be formally arrested on June 3, 2015. (Wool deposition, page 54, lines 12-15 ). In fact, Wool stated Stone will probably or more than likely go home tonight. <u>Id</u>.

47.  Admitted, but this report was issued in 2018.

48.  Admitted with clarification.  The subject policy does not specifically prohibit a medical professional from practicing holistic medicine to treat inmates, who are also medical patients.

49.  Admitted.

50.  Admitted.

51.  Admitted.

52.  Admitted with clarification.  Stone was escorted off SCI Muncy property at 4:15 PM, four (4) hours and fifteen (15) minutes after his arrival at the Security Office.

53.  Admitted.

54.  Admitted.

55.  Admitted.

56.  Admitted.

17

57.   Admitted with clarification.  The record reveals that other

third party contractors subjected to PREA investigation were

treated fairly, while the record establishes Stone was

detained well beyond the preliminary PREA investigation.


Respectfully Submitted,

S:/ Gregory T. Moro, Esquire
Gregory T. Moro, Esquire
121 E. Market Street
Danville, PA 17821
(570) 784-1010
Attorney ID # 56089

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DONALD J. STONE AND** | **:   CIVIL ACTION-LAW** |
| **DEBORAH L. STONE** | **:** |
| **Plaintiffs** | **:HONORABLE JOHN JONES,III** |
| **Vs.** | **:** |
| | **:** |
| **SHAWN WALTMAN,** | **: NO. 4:17-CV-0864** |
| **JAMES WOOL, CORRECT** | **:** |
| **CARE SOLUTIONS, LLC,** | **:** |
| **LESLIE BLAIR-MORRISON,** | **:** |
| **WENDY NICHOLAS,** | **:** |
| **WILLIAM FRANTZ, JOHN** | **:** |
| **WETZEL, MICHAEL SHIREY,** | **:** |
| **AARON BIICHLE, ROBERT** | **:** |
| **SMITH, TYREE C. BLOCKER,** | **:** |
| **CHELSEY CAMP, CHERYL** | **:** |
| **BASKERVILLE** | **:** |
| **Defendants** | **:** |

### CERTIFICATE OF SERVICE

**I, Gregory T. Moro, Esquire, hereby certify that on April 6, 2020, I**

**served a true and correct copy of the foregoing document titled**

19

**Plaintiffs' Answers to Defendants' Statement of Undisputed Material**

**Facts to the following parties of record:**

**VIA ECF:**

**Allison Deibert**
**Deputy Attorney General**
**Office of the Attorney General**
**15th Floor, Strawberry Square**
**Harrisburg, PA 17120**
**Counsel for DOC and PSP Defendants**

**Karen Romano**
**Chief Deputy Attorney General**
**Office of the Attorney General**
**15th Floor, Strawberry Square**
**Harrisburg, PA 17120**
**Counsel for DOC and PSP Defendants**

**s/*Gregory T. Moro, Esquire***