## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD J. STONE and | : | |
| DEBORAH L. STONE, | : | 17-CV-864 |
| | : | |
| Plaintiffs, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| SHAWN WALTMAN *et al.*, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

### July 20, 2020

Presently pending before the Court are two motions for summary judgment filed by various Defendants in the above-captioned case ("the Motions"). (Docs. 68, 69). The Motions have been fully briefed, (Docs. 70, 71, 80, 81, 83, 84), and are ripe for disposition. For the reasons that follow, the Motions shall be granted in part and denied in part.

### I. BACKGROUND

Plaintiff Dr. Donald Stone ("Dr. Stone") was a physician employed by Correct Care Solutions ("CCS"). (Doc. 72 at ¶ 1). CCS assigned Dr. Stone to serve as the Medical Director at Pennsylvania State Correctional Institution Muncy ("SCI Muncy"). (*Id.* at ¶ 2). To be clear, however, Dr. Stone was not an employee of the Pennsylvania Department of Corrections or SCI Muncy. (*Id.*).

On June 3, 2015, an inmate at SCI Muncy, Cheryl Baskerville ("Baskerville"), reported to a security officer that she had observed Dr. Stone inappropriately touch her cellmate, inmate Chelsea Camp ("Camp"), while Camp and Baskerville were in the infirmary.  (*Id*. at ¶¶ 22–23).  SCI Muncy's Security Captain Defendant Shawn Waltman ("Waltman") investigated the complaint pursuant to the Prison Rape Elimination Act[1] by interviewing Baskerville and Camp. (*Id*. at ¶¶ 24–28).  Waltman then asked Defendant Leslie Blair-Morrison ("Blair-Morrison"), SCI Muncy's Corrections Health Care Administrator and a CCS employee, to ask Dr. Stone to come to the Security Office.  (*Id*. at ¶ 29).  When Dr. Stone arrived, Waltman interviewed him.  (*Id*. at ¶ 32).  The exact circumstances under which this interview took place remain unclear.  Dr. Stone contends that he was interviewed for over four hours in a "holding cell," that he did not have access to his phone, his office, or the outside world, and that he was never issued any kind of warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966).  (Doc. 79 at ¶¶ 32–33).  Defendants, however, aver that Dr. Stone was interviewed

---

[1]     Relevant here, the Prison Rape Elimination Act ("PREA") is a federal law passed by Congress in 2003 to establish national standards for collecting data on prison rapes, increasing accountability among prison officials, and protecting the Eighth Amendment rights of federal, state, and local prisoners. 34 U.S.C. §30302.  The federal Act, of course, applied immediately to federal prisons, but Congress also included a financial incentive for state and local prisons to adopt compliant standards. 34 U.S.C. §30307(2)(A) (providing for a five percent reduction in federal prison funds for states that do not comply with national standards).  Unsurprisingly, the Pennsylvania Department of Corrections ("DOC") adopted a policy in compliance with national standards. Pennsylvania Department of Corrections, Prison Rape Elimination Act (PREA), Policy No. DC-ADM 008.

in the Security Office itself and insist that Dr. Stone was permitted to leave to go to the bathroom during the course of the interview.  (Doc. 72 at ¶¶ 32, 35).  Although Dr. Stone concedes that he was permitted to leave to use the restroom, he emphasizes that he was escorted by SCI Muncy Corrections Office Michael Shirey ("Shirey") to ensure that he would not leave the building.  (Doc. 79 at ¶ 33, 35).  At some point during Dr. Stone's interview, Pennsylvania State Police Trooper William Wool ("Trooper Wool") arrived and joined in the questioning.  (*Id*. at ¶ 33).

During his interview, Dr. Stone admitted to kissing Camp, to providing her with food, and to exchanging notes with her.  (*Id*. at ¶ 36–40).  A consent search of Dr. Stone's car revealed a notebook which included exchanges between Dr. Stone and Camp.  (*Id*. at ¶¶ 43–44).  Defendants characterize these communications as inappropriately intimate.  (*Id*. at ¶ 40).  Dr. Stone, however, insists that "[t]he notes between Camp and Stone were part of Stone's holistic approach to the practice of medicine, which focuses on treating the mind and body."  (Doc. 79 at ¶ 40).

Following Dr. Stone's admissions and discovery of the notebook, Superintendent Robert Smith, the Superintendent of SCI Muncy, revoked Dr. Stone's security clearance, (Doc. 72 at ¶¶ 49–50), Waltman escorted Dr. Stone off the premises, (*id*. at ¶¶ 51–52), and CCS subsequently terminated Dr. Stone's employment.  (*Id*. at ¶ 55).

Shortly thereafter, the Commonwealth of Pennsylvania filed criminal sexual assault charges against Dr. Stone in the Lycoming County Court of Common Pleas.  In pretrial proceedings, the trial court suppressed Dr. Stone's statements as well as the contents of the notebook discovered in his car.  Dr. Stone eventually pleaded guilty to two summary charges for providing food to Camp in violation of Department of Corrections policy.

On May 16, 2017, Dr. Stone and his wife, Plaintiff Deborah L. Stone ("Mrs. Stone"),[2] commenced this action by Complaint. (Doc. 1).  Various Defendants filed motions to dismiss on July 14, 2017 and on July 17, 2017. (Docs. 14, 16). Plaintiffs filed an Amended Complaint on August 3, 2017.  (Doc. 25).

Plaintiffs' Amended Complaint—the operative Complaint in this case— stated fifteen causes of action under both federal and state law.  Counts I–VIII, XII, and XIV stated causes of action under 42 U.S.C. §1983 ("Section 1983") for deprivations of Dr. Stone's Fourth, Fifth, and Fourteenth Amendment rights as well as allegations of civil conspiracy and supervisory liability. Counts IX, X, and XIII asserted state law tort claims for wrongful termination, tortious interference with a business relationship, and civil conspiracy to wrongfully terminate.  Count XV asserted a claim under 42 U.S.C. §1988 for attorney's fees.  Finally, Mrs. Stone stated a claim for loss of consortium in Count XI.

---

[2]    We refer to Dr. Stone and Mrs. Stone collectively as "Plaintiffs."

Following several motions to dismiss,[3] two voluntary dismissals,[4] and several concessions outlined in Plaintiffs' brief in opposition to the instant motions for summary judgment,[5] the following causes of action remain viable as against the following named Defendants:  (1) Counts I and II – Fourth Amendment violations against Waltman, Shirey, and Wool under Section 1983; (2) Count XII – Fourteenth Amendment Equal Protection claim against Waltman under Section 1983; and (3) Counts X and XIII – state law claims of tortious interference and conspiracy to wrongfully terminate against Blair-Morrison.

Following completion of discovery, on February 27, 2020, Defendants filed two motions for summary judgment, (Docs. 68, 69), and briefs in support thereof. (Docs. 70, 71).  Plaintiffs filed briefs in opposition on April 6, 2020, (Docs. 81, 82), and Defendants filed Replies on April 20, 2020.  (Docs. 83, 84).  The Motions are ripe for disposition.  For the reasons that follow, the Motions shall be granted in part and denied in part.

---

[3]    Defendants filed motions to dismiss on August 16, 2017, (Doc. 29), August 17, 2019, (Doc. 32), and August 22, 2017. (Doc. 33).  The Court granted these motions in part.  (Doc. 43).

[4]    Plaintiffs voluntarily withdrew all claims against Defendant Aaron Biichle and Defendant CCS.  (Doc. 61).

[5]    In their briefs in opposition to the instant motions for summary judgment, Plaintiffs consent to voluntary dismissal of Defendants John Wetzel, Robert Smith, and Tyree Blocker as to Count XIV. Thus, Count XIV shall be dismissed in its entirety.  Plaintiffs also consent to the voluntary dismissal of Defendant Blair-Morrison as to Counts I and II and Defendant Blair-Morrison and Defendant William Frantz, SCI Muncy's PREA Compliance Manager, as to Count XII.  (Docs. 80 at 11; Doc. 81 at 18).  Accordingly, those Counts shall be dismissed as against those Defendants.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law.  *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence.  *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial.  *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  In advancing their positions, the parties must support their factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."

FED. R. Civ. P. 56(c)(1).  A plaintiff that fails to dispute a genuine issue of material

fact as to any of the elements of his or her *prima facie* case has not met his or her

initial burden and summary judgment is properly granted for the defendant.

*Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

A court should not grant summary judgment when there is a disagreement

about the facts or the proper inferences that a factfinder could draw from them.

*See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh*

*Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)).  Still, "the mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment."  *Layshock ex rel. Layshock v.*

*Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477

U.S. at 247-48) (internal quotation marks omitted).

## III.   DISCUSSION

In their motions and accompanying briefs, Defendants seek summary

judgment as to all still-viable claims in Plaintiffs' Amended Complaint.  Although

the Defendants filed separate motions, we group the arguments together for

efficiency and address each group of arguments *seriatim*.

### a. Counts I and II – Fourth Amendment Claims against Waltman and Shirey

In the first issue, Defendants argue that they are entitled to summary judgment as to Plaintiffs' Fourth Amendment claims against Waltman and Shirey as outlined in Counts I and II. According to Defendants, Waltman's and Shirey's questioning of Dr. Stone amounted to no more than a lawful and reasonable investigation by an employer into employee misconduct and their subsequent search of Dr. Stone's vehicle was conducted with consent. Moreover, Defendants reason, under the PREA, Waltman was required as the Security Captain to investigate the allegations against Dr. Stone as a matter of law and, when viewed in context, the seriousness and credibility of the allegations, Dr. Stone's subsequent admissions, and the discovery of the incriminating evidence in his vehicle suggest that Waltman's and Shirey's conduct was reasonable. Thus, even if Waltman's and Shirey's conduct implicated the Fourth Amendment vis-à-vis a seizure or a search, that conduct was fully within constitutional bounds. Finally, Defendants continue, even had an unreasonable search or seizure occurred, Waltman and Shirey had probable cause to question Dr. Stone and search his vehicle. Accordingly, Defendants conclude, they are entitled to summary judgment as to Plaintiffs' Fourth Amendment claims against Waltman and Shirey in Counts I and II. We disagree.

As both Plaintiffs and Defendants note, "[a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *California v. Hodari D*, 499 U.S. 621, 627–28 (1991) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  Testimony from the suppression hearing at Dr. Stone's underlying criminal case indicated that Dr. Stone was not permitted to leave SCI Muncy until Waltman permitted him to do so.  (Doc. 79-1).  Indeed, all parties acknowledge that Dr. Stone was only permitted to go to the bathroom with an escort.  Construing this evidence in the light most favorable to the non-moving party—as we must—a genuine issue of material fact remains as to whether Dr. Stone or a similarly situated person would have felt free to leave and, therefore, whether he was seized for Fourth Amendment purposes.  *Hodari D*, 499 U.S. at 628 ("A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").  Thus, we are compelled to deny Defendants' motion for summary judgment predicated thereon.

For the same reason we reject Defendants' efforts to characterize Waltman's and Shirey's questioning of Dr. Stone and the subsequent search of his vehicle as inherently reasonable and within the bounds of the Fourth Amendment.  "It is . . .

clear that the Fourth Amendment applies only to unreasonable searches and seizures." *Dykes v. Se. Pennsylvania Transp. Auth.*, 68 F.3d 1564, 1567 (3d Cir. 1995) (citing *Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 619 (1989)).  "What is reasonable 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" *Id.*  "Courts are required to 'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* (citing *United States v. Place*, 462 U.S. 696, 703 (1983)).

In this case, Defendants' aver that their questioning of Dr. Stone and the subsequent search of his vehicle was objectively reasonable because Waltman was obligated under the PREA to conduct the investigation, Camp's and Baskerville's allegations against Dr. Stone seemed credible, and the questioning by Waltman and Shirey resulted in several incriminating admissions and the discovery of incriminating evidence.  Plaintiffs, however, tell a very different story.  According to Plaintiffs, the basis for Dr. Stone's seizure was dubious; the initial complaints from Baskerville and Camp were inconsistent and the follow-up interviews of the complainants were flawed.  Thus, the seizure and the search which resulted therefrom was unreasonable and completed without probable cause.  Moreover, Plaintiffs point out, Dr. Stone was held for more than four hours in a holding cell

and was allowed to use the restroom only with an escort—an unusual procedure for a routine PREA investigation.  Thus, in our view, there remains a genuine issue of material fact as to whether Waltman's and Shirey's conduct was reasonable and proportional under the circumstances such that entry of summary judgment in their favor must be denied. *See Reedy*, 615 F.3d at 210 (finding that a court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them); *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987) ("Individuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer. The operational realities of the workplace, however, may make some employees' expectations of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official.").

Likewise, we also reject Waltman's and Shirey's contention that they had probable cause to seize Dr. Stone and subsequently search his vehicle.  "Generally, the question of probable cause in a section 1983 damage suit is one for the jury. This is particularly true where the probable cause determination rests on credibility conflicts." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) (citations and internal quotation marks omitted). "However, a district court may conclude that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding, and

may enter summary judgment accordingly." *Id.* at 788–89 (internal quotation marks omitted).  Here, viewing the evidence in the light most favorable to the Plaintiffs, a reasonable fact-finder could conclude that Dr. Stone was seized without probable cause and that, therefore, the subsequent consent search of his vehicle was problematic.  Plaintiffs contend that there were inconsistencies in Camp's and Baskerville's reports and that Waltman's investigation was flawed.  In our view, a reasonable jury could conclude based upon those allegations—if credited—that Waltman and Shirey lacked probable cause to seize Dr. Stone and effectuate the subsequent search of his vehicle.  *Merkle*, 211 F.3d at 788 ("Generally, the question of probable cause in a section 1983 damage suit is one for the jury. This is particularly true where the probable cause determination rests on credibility conflicts.").  This is particularly true in this case where the trial court in Dr. Stone's underlying criminal sexual assault case deemed his admissions and the evidence discovered in his vehicle inadmissible.  Thus, based on our standard of review, we are constrained to deny Defendants' motion for summary judgment in Counts I and II as to Waltman and Shirey.

### b. Counts I and II – Fourth Amendment Claims against Trooper Wool

In the next issue, Defendants argue that they are entitled to summary judgment as to the Fourth Amendment claims against Trooper Wool outlined in Counts I and II.  According to Defendants, Dr. Stone was seized by Waltman and

not Trooper Wool; Trooper Wool did not initiate Dr. Stone's detention, Trooper
Wool, therefore, could not have contributed to Dr. Stone's alleged belief that he
was not free to leave, and Trooper Wool could not be considered to have seized Dr.
Stone.  Likewise, Defendants continue, even if Trooper Wool seized Dr. Stone and
even if that seizure is deemed unreasonable, he had probable cause to do so based
upon Camp's and Baskerville's allegations and Dr. Stone's subsequent admissions
to Waltman prior to his arrival.  Finally, Defendants conclude, because Dr. Stone
consented to the search of his car, the search was within the bounds of the Fourth
Amendment.  Indeed, even had Dr. Stone refused consent to the search,
Defendants conclude, the car would have been subject to search because it was
parked on prison property.  (Doc. 71 at 12 (citing *New York v. Burger*, 482 U.S.
691, 699–703 (1987) (holding that warrantless searches in closely-held businesses
are constitutional)).  For similar reasons to those discussed *supra*, we disagree with
Defendants' conclusion that Trooper Wool is entitled to summary judgment as to
Counts I and II.

As aforementioned, there remains a genuine issue of material fact as to
whether Dr. Stone was seized for purposes of the Fourth Amendment and whether
the subsequent search of his vehicle was constitutionally infirm based upon the
unique circumstances presented.  Defendants' assertions support the same
conclusion.  Interestingly, Defendants aver that Trooper Wool's presence on the

scene was in support of an internal PREA investigation, rather than a criminal investigation, (Doc. 71 at 9), but they also do not contest Trooper Wool's contact with a county prosecutor inquiring as to the best method to conduct a search of Dr. Stone's vehicle and do not contest that Dr. Stone's admissions and fruits of the search of his vehicle were suppressed.  Accordingly, based on the strange circumstances before us and the case's complicated procedural history before the state trial courts, we are constrained to conclude that there are genuine issues of material fact which preclude entry of summary judgment in favor of Trooper Wool at this time.

Likewise, as also noted *supra*, there are genuine issues of material fact as to whether Trooper Wool had probable cause to seize and/or search Dr. Stone were we to conclude that such a seizure occurred.  Here, Trooper Wool alleges that he was not conducting a criminal investigation, yet in the same breath insists that Camp's and Baskerville's allegations would have authorized him to do so. However, to reiterate, Plaintiffs point out various alleged inconsistencies in Camp's and Baskerville's stories, the flawed nature of Waltman's subsequent investigation, and Blair-Morrison's awkward intervention into the matter.  In our view, these issues create a genuine issue of material fact which precludes the entry of summary judgment in Trooper Wool's favor.  Accordingly, we shall deny Defendants' motion for summary judgment to the extent it is premised thereon.

Finally, we find that the genuine issues of material fact which preclude the entry of summary judgment as to whether Dr. Stone was seized for purposes of the Fourth Amendment, whether such seizure and subsequent search was unreasonable, and whether Trooper Wool had probable cause to seize and/or search Dr. Stone under the circumstances also create genuine issues of material fact as to whether Trooper Wool is entitled to qualified immunity as to the same and we shall deny Defendants' motion for summary premised thereon. *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) ("Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis. Thus, while we have recognized that it is for the court to decide whether an officer's conduct violated a clearly established constitutional right, we have also acknowledged that the existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue.").

### c. Count XII – Fourteenth Amendment Equal Protection claim against Waltman

In the next issue, Defendants argue that Plaintiffs' equal protection claim is not viable because Dr. Stone has not substantiated in discovery that he was in any way discriminated against based upon his status as a member of a protected class or that he was treated any differently than other similarly situated individuals.

Indeed, Defendants reason, Dr. Stone has not identified any other employee at SCI Muncy that had been accused of sexual assault and has failed to identify in the record any basis to conclude that other employees subject to a PREA investigation were treated any differently.  We agree.

"To succeed on a § 1983 equal protection claim, Plaintiff must allege facts demonstrating 'purposeful discrimination' and that he 'receiv[ed] different treatment from that received by other individuals similarly situated.'" *Green v. Chester Upland Sch. Dist.*, 89 F.Supp.3d 682, 692 (E.D. Pa. 2015) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)).  To meet the *prima facie* elements of an equal protection claim, a plaintiff must allege that he or she was: (1) a member of a protected class; (2) similarly situated to members of an unprotected class; and (3) treated differently from members of the unprotected class. *Oliveira v. Twp. of Irvington*, 41 Fed.App'x. 555, 559 (3d Cir. 2002); *Keenan v. City of Philadelphia*, 983 F.2d 459, 465 (3d Cir. 1992).

In the instant case, Plaintiffs have not identified any basis in the record to conclude that Dr. Stone was in any way subject to purposeful discrimination.  The record is also devoid of any reason to conclude that Dr. Stone's treatment was the result of his membership in any class, protected or otherwise.  As Defendants note, other than generalized allegations and unsubstantiated conclusions, Plaintiffs have not identified any other instance where another employee was subject to a similar

PREA investigation and was treated any differently.  We are thus constrained to conclude that no genuine issue of material fact remains, and that Defendants are entitled to summary judgment as a matter of law as to Count XII.

### d. Counts X and XIII – State law claims of tortious interference and conspiracy to wrongfully terminate against Blair-Morrison

In their next issue, Defendant argue that Blair-Morrison is protected from both of Plaintiffs' still-viable state-law tort claims outlined in Counts X and XIII based upon state sovereign immunity. According to Defendants, Blair-Morrison was acting within the scope of her employment, Plaintiffs' allegations do not meet any of the exceptions to sovereign immunity outlined in 42 Pa.C.S. § 8522, and, therefore, sovereign immunity bars both of Plaintiffs claims against her.

Plaintiffs disagree.  According to Plaintiffs, Waltman asked Blair-Morrison to interview Baskerville even though Blair-Morrison was not a PREA investigator and was not Dr. Stone's supervisor.  Thus, Plaintiffs infer, "Blair-Morrison could have told Waltman that she felt it was inappropriate for her to be involved in an investigation where PREA protocol may be invoked" and, therefore, it must be that "Blair-Morrison's motives were conniving."  (Doc. 80 at 30–31).  Indeed, Plaintiffs posit, Dr. Stone and Blair-Morrison never got along, and Blair-Morrison had even indicated to Dr. Stone at one point that she intended to have him fired because she disagreed with his novel treatment protocols.  Plaintiffs then baldly conclude, "[i]t is Stone's belief that Blair-Morrison, who disliked Stone intensely

and wanted him fired, influenced Camp and Baskerville to make false PREA reports, so as to ensure that Stone would be terminated from employment and prosecuted." (*Id.* at 32).

The Commonwealth of Pennsylvania, its agencies, and its employees acting within the scope of employment enjoy sovereign immunity from suit unless specifically waived by statute. *See* 1 Pa.C.S. § 2310; 42 Pa.C.S. § 8522. A Commonwealth employee acts within the scope of employment "if: (a) it is the kind [of conduct the employee] is employed to perform; (b) [the conduct at issue] occurs substantially within the authorized time and space limits [and] (c) [the conduct at issue] is actuated, at least in part, by a purpose to serve the master." *Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000) (quoting RESTATEMENT (SECOND) AGENCY § 228); *Kull v. Guise*, 81 A.3d 148, 158–59 (Pa. Cmwlth. 2013). In general, an employee is said to be performing the kinds of work he or she is employed to perform when said conduct occurred when he or she was acting as an employee rather than as a private individual. *See Mitchell v. Luckenbill*, 680 F. Supp. 2d 672, 683 (M.D. Pa. 2010) ("Defendants were on duty, in uniform, and investigating a crime throughout the duration of the alleged offenses. Thus, sovereign immunity applies."); *Cooper v. Beard*, No. CIV.A. 06-0171, 2006 WL 3208783, at *16 (E.D. Pa. Nov. 2, 2006) ("At all times they were acting as DOC and/or Graterford prison officials, thus sovereign immunity applies.").

As a preliminary matter, Plaintiffs do not contest that Blair-Morrison is a Commonwealth employee entitled to the protections of sovereign immunity. Rather, Plaintiffs' insist that Blair-Morrison's interview of Baskerville at Waltman's request was beyond the scope of her employment. Plaintiffs' argument is misguided. In our view, as SCI Muncy's Corrections Health Care Administrator, Blair-Morrison's discussions with Baskerville is plainly the kind of conduct for which she is employed and she was plainly acting in that role and not as a private citizen. We also note that Blair-Morrison's interview of Baskerville occurred substantially within the authorized time and space limits of her employment, and was actuated, at least in part, to serve her employer. Although Blair-Morrison was not specifically employed in an investigative capacity, discussing a PREA complaint with an inmate is not so far outside the bounds of her role as an administrator such that sovereign immunity is lost simply because Plaintiffs speciously assert it also simultaneously served her own ends.

In that vein, we reject Plaintiffs' unsubstantiated efforts to paint a nefarious picture of Blair-Morrison's intentions. Plaintiffs have presented absolutely no basis to conclude that Blair-Morrison "told Baskerville what type of serious PREA allegations would facilitate Stone's termination of employment" or that "Baskerville told Camp of her conversation with Blair-Morrison or Camp heard the information in the very small cell, thereby spurring the false PREA report against

Stone." (Doc. 81 at 33).  Rather, based on the evidence presented, there is no genuine issue of material fact that Waltman asked Blair-Morrison to interview Baskerville after Baskerville initiated a PREA complaint against Dr. Stone.  Blair-Morrison did so.  At some point thereafter, Waltman asked Blair-Morrison to accompany Dr. Stone to the Security Office after which Blair-Morrison's involvement in the interaction ceased.  Accordingly, we find that Defendants are entitled to summary judgment as a matter of law as to Counts X and XIII and shall grant their motion to the extent it is premised thereon.

## IV. CONCLUSION

In accordance with the foregoing, Defendants' motions for summary judgment, (Docs. 68, 69), shall be granted in part and denied in part.  To be clear, the following causes of action remain viable for trial:  Fourth Amendment claims under Section 1983 as outlined in Counts I and II as against Waltman, Shirey, and Wool.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The following claims in Plaintiffs' Amended Complaint are **DISMISSED** as withdrawn:  Counts I and II as against Defendant Blair-Morrison; Count XII as against Defendants Blair-Morrison and William Frantz; Count XIV in its entirety.

2.    Defendant's Motions for Summary Judgment, (Docs. 68, 69), is

       **GRANTED** in full as to Counts X, XII, and XIII.

3.    Defendant's Motions for Summary Judgment, (Docs. 68, 69), is

       **DENIED** in all other respects.

4.    Defendants John Wetzel, Robert Smith, Leslie Blair-Morrison,

       William Frantz, and Tyree Blocker are **DISMISSED** as Defendants in

       this case.

5.    To the extent that the parties believe it would be beneficial, the Court

       will refer the matter to Chief Magistrate Judge Schwab for assignment

       and scheduling of a settlement conference or private mediation.  The

       parties **SHALL NOTIFY** the Court of their interest in a settlement

       conference or private mediation by filing a letter on the docket.

6.    Within ten (10) days of the date of this Order, the parties **SHALL**

       **COLLABORATE AND FILE** a stipulation setting forth a new trial

       month.  The Court's calendar is attached for the convenience of the

       parties.


                                        <u>/s/ John E. Jones III</u>
                                        John E. Jones III, Chief Judge
                                        United States District Court
                                        Middle District of Pennsylvania